Joseph Marsala AF9575
Name and Prisoner/Booking Number

San Quentin State Prison  5-N-32
Place of Confinement

San Quentin, Ca.
Mailing Address

San Quentin, Ca. 94964
City, State, Zip Code

**FILED**

**OCT 03 2023**

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

(Failure to notify the Court of your change of address may result in dismissal of this action.)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

Joseph Marsala J.
(Full Name of Plaintiff)
                            Plaintiff,

            v.

(1)Ralph Diaz, (no longer a defendant)
(Full Name of Defendant)

(2)Kathleen Allison, (no longer def.,)

(3) Ron Davis,

(4) Patrick Eaton,
                            Defendant(s).

☐ Check if there are additional Defendants and attach page 1-A listing them.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.  1:22-cv-00843-ADA-BAM (PC)
(To be supplied by the Clerk)

JURY DEMAND TRIAL

**CIVIL RIGHTS COMPLAINT
BY A PRISONER**

☐ Original Complaint
☒ First Amended Complaint
☐ Second Amended Complaint

**RECEIVED**

OCT 03 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

## A. JURISDICTION

1.  This Court has jurisdiction over this action pursuant to:
    ☒ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983
    ☐ 28 U.S.C. § 1331; Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971)
    ☐ Other: _____

2.  Institution/city where violation occurred:  Sierra Conservation Center

## B. DEFENDANTS

1. Name of first Defendant: Ron Davis_____. The first Defendant is employed as:
Associate Director(Rec. Cent. Adult Inst.) at Sierra Conservation Center.
   (Position and Title)                              (Institution)

2. Name of second Defendant: Patrick ~~Ralph Diaz~~ Eaton___. The second Defendant is employed as:
Warden_____ at Sierra Conservation Center.
   (Position and Title)                              (Institution)

3. Name of third Defendant: Katie Brown_____. The third Defendant is employed as:
Chief Medical Officer_____ at Sierra Conservation Center
   (Position and Title)                              (Institution)

4. Name of fourth Defendant: E. Spangler_____. The fourth Defendant is employed as:
Administrative Officer of the Day at 12-9-20 to 12/16/20( S.C.C.)
   (Position and Title)                              (Institution)

If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.

## C. PREVIOUS LAWSUITS

1. Have you filed any other lawsuits while you were a prisoner?   [X] Yes   [ ] No

2. If yes, how many lawsuits have you filed? __2__. Describe the previous lawsuits:

   a. First prior lawsuit:
      1. Parties: Joseph Marsala___ v. Ralph Diaz, et. al.___
      2. Court and case number: 2:19-cv-00513-CKD-___
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) settlement___

   b. Second prior lawsuit:
      1. Parties: Marsala v. Ra___
      2. Court and case number: 1:20-cv-01794-JLT (PC)___
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) still pending___

   c. Third prior lawsuit:
      1. Parties: _____ v. _____
      2. Court and case number: _____
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?)_____

If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.

DEFENDANTS (cont.)

A.

John/Jane Doe A.O.D. from 12-2-20 to 12-9-20 (request Assign. schedule)
                 S.C.C.                    (per D.O.M. 51050.4      -)
Trent Allen, Chief Deputy Warden at Sierra Conservation Center

John/Jane Doe Fac. B Watch Commander 3rd watch on 12-15-20(request Assign.)
                                   at S.C.C.        (schedule      )
John/Jane Doe Fac. B Lieutenant 3rd watch on 12-15-20(request Assign.      )
                                   at S.C.C.  (schedule            )
Sgt. Martinez Fac. B 3rd watch on 12-15-20 at S.C.C.

2 (A)

## D. CAUSE OF ACTION

### CLAIM I

1.  State the constitutional or other federal civil right that was violated: <u>Conditions of Confinement</u>
    <u>8th amendment</u>

2.  **Claim I.** Identify the issue involved. Check **only one.** State additional issues in separate claims.
    - [x] Basic necessities
    - [ ] Disciplinary proceedings
    - [ ] Excessive force by an officer
    - [ ] Mail
    - [ ] Property
    - [ ] Threat to safety
    - [ ] Access to the court
    - [ ] Exercise of religion
    - [ ] Other: _____
    - [ ] Medical care
    - [ ] Retaliation

3.  **Supporting Facts.** State as briefly as possible the FACTS supporting Claim I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

    <u>See STATEMENT OF FACTS</u>

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

4.  **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
    <u>I contracted covid-19, foggy thinking/memory, my joints and tendons, are
    weak and painful,back pain exceedingly worse,bleeding noses,and iget lost
    in middle of thoughts , headaches, frequent lightheadedness</u>

5.  **Administrative Remedies:**
    a.  Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?    [ ] Yes   [x] No
    b.  Did you submit a request for administrative relief on Claim I?    [x] Yes   [ ] No
    c.  Did you appeal your request for relief on Claim I to the highest level?    [x] Yes   [ ] No
    d.  If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

3

STATEMENT OF FACTS

1.

2. On 12-6-20, Sierra Conservation Center's Chief Medical Executive

3. recieved two positive Covid-19 tests from Facility B,(see Ex. A,Daily

4. program status Report) and ordered testing for entire yard for Covid-19,

5. and ordered a restriction on movement, "...only essential Moves/emergent

6. Moves..."

7. On 12-9-20, (62) of the ordered tests were found to have had Covid,

8. from 14 dorms on facility B(S.C.C.) known to defendants Patrick Eaton, et.al.

9. and the pre-covid world, that those inmates in the 14 dorms who were

10. exposed, needed to be kept from the rest of the population. A special

11. circumstance the warden is required to disclose to his replacement during

12. non business hours, known as the A.O.D. (Administrative officer of the Day)

13. and is discussed in "Face to Face briefing", between them, and the replac

14. replacement A.O.D., and Chief Deputy Warden, every Thurs. by 5 p.m.

15. See CDCR D.O.M. 511103198. *(See Also Ex D Negative Test since Order of 12-6-2*

16. This meeting of the minds, discusses the Administrative Requirements

17. that needed to be met., mainly to prevent the spread of Covid-19,

18. From the (12-09-20) 62 positive Covid test findings, Right???

19. Yet, mass moves began to occur immediately, and continued until the

20. 12-15-20, moves petitioner will show violated his 8th amendment

21. conditions of confinement protections, because the (4) inmates who moved

22. into petitioner dorm, had been from (2) of the identified Dorms in Ex. A.

23. An unreasonable response to whatever essentiality/emergency Administration

24. claimed to have made the moves for, as it succeeded in the opposite goal,

25. of prevention of Covid-19 spread. See Declaration of Patricio Gonzalez, *Ex.B*

26. and if petitioner may,quote another plaintiffs pleadings, in Victory v.

27. Allison, 2023 U.S. Dist. Lexis 97317 in footnote [7] "...on December 12

28. 2020, John Doe 1 Authorized inmate Dunkirk to be relocated from dorm 30

1.  to dorm 52, moved from dorm 30 because a number of inmates tested
2.  positive for Covid-19."..." (same A.O.D.,prison Fac.,and failure to protect)
3.     These accounts evidences the voracity of the Oathes given by defendants
4.  to protect the rights of all people, while shooting bullets into the
5.  crowd of people that oath really encompasses. Each "already exposed
6.  inmate" moved into a dorm of unexposed inmates, are the bullets that
7.  could have struck petitioner,lethally, or any other person in the
8.  pre-vaccine Covid-19 world. "unreasonable risk to petitioner" that
9.  the "entire world knew of" including defendants, who for the duration of
10. at least 6 days, failed to make the moves stop, or report the failure
11. to follow Chief Medical Executive Orders. This resulted in the 99.9%
12. of Fac. B population contracting the Covid-19 lethal virus.
13.    The dialogue between defendant Sgt. Martinez, and petitioner the day
14. of the 12-15-20 3rd watch moves, followed the result of other inmates'
15. laying down in front of the door protesting against the (4) inmates
16. being moved into the dorm #69, where Sgt. Martinez threatened to send
17. them to a G.P. yard that they would be attacked on, and petitioner
18. questioned him, "Who are you talking to?" and he said, "All of you!"
19.    This threat is loaded, considering the A.O.D, for that day was a
20. CCIII level Counselor/Captain who's office is in the trailer where
21. counselor's decide transfers of inmates." (and in 4 person face to face)
22.    The grievance petitioner filed was answ3ered by another member of the
23. 4 person face to face briefing of 12-9-20 A.O.D. duty cycle exchange, the
24. Chief Deputy Warden T. Allen (see Ex _C_  grievance log # 000000074630)
25. and he hid facts about his own involvement of the moves which occurred
26. on 12-15-20, and every other person responsible for the passing on of
27. Chief Medical Executive order to not make moves, for Covid-19 spread
28. prevention. (The Warden, A.O.D. coming/going and Chief Deputy Warden)

1. Petitioner would ask defendants "Why?" Thereby requesting a Trial

2. by Jury. Why didn't you use empty dorm space? There were completely

3. empty dorms, when all these moves occurred, exposing petitioner who

4. Medical had been made aware of, only 6 hours before the day of the moves

5. on 12-15-20, that yet again I tested negative to Covid-19, (on 12-11-20 testings)

6. Which brings us to petitioner's belief as to Why the moves made

7. during need to quaranteen 8 more days, while there were empty dorm spaces

8. the last 6 days' moves created.

9. This belief begins on Ex. A's, three signatures, who they are and

10. their titles. Particularly Ron Davis the Associate Director of Reception

11. Centers, Adult Division. It was rumored that a Reception Center was

12. being implemented, and petitioner believes a more loosely intrepretation

13. of "essential moves" was used by defendants to cover-up the Herd immunity

14. fast lane to more Reception Center space, as soon as everyone caught and

15. got over covid-19, we can start shipping inmates in, combined with

16. loose interpretation of "operational neccessity" in the 5058.3 penal code

17. relative to regulation revisions. For instance Covid-19 clogged the entire

18. Judicial System, from County to Prisons, and a running Reception Center

19. at S.C.C. would be perfect, but Covid 19 spread prevention plan gained

20. space, through steps taken but used that won space subjectively to

21. make and implement, and provide space for a reception center schedule

22. and disregarded the risk made exposing 28 human lives including petitioner

23. to the deadly pre-vaccine world killer Covid-19. With empty dorms available.

24. Petitioner originally intended to blame Ralph Diaz, Kathleen Allison,

25. and or Jeffrey MaComber, because only they could authorize or even

26. make regulation revisions under penal Code 5058.3. to create a new

27. Reception Center, but petitioner watched "ONLY" S.C.C. administration

28. make moves, and Medical administration failing to report for danger of it.

1.  Ron Davis was the executive officer, in the position to make regulation

2.  changes, and request approval by Ralph Diaz to make a reception center

3.  at SS.C.C. and was responsible for implementation of it, and the use of

4.  Covid-19 spread prevention won space, for reception center, intead of

5.  physical distanceing original intention. And is being sued in his

6.  individual capacity, as the head of the conspiracey to use Covid-19

7.  steps to win space for a Reception Center, compact inmates, with

8.  Covid-19 infected inmates, when multiple empty dorms are available.

9.  BuzpMan Eaton was warden at S.C.C. and signed all EX. A's(DPSR's)

10. acknowledgeing the special circumstances involved with keeping exposed

11. and unexposed inmates from being moved into and from the 14 dorms found

12. to have had Covid-19 in them, and was part of the 4 person face to face

13. briefing on 12-9-20 to inform new oncoming A.O.D. about the Chief Medical

14. Executivess order to not move inmates nonessentially or emergent. And

15. allowed everyday nonessential moves take place moving people to

16. opposite sections of Reception Center area, since 12-9-20 order until

17. 12-15-20 moves, and failed to make it stop. And is being sued in his

18. individual capacity for allowing conditions of confinement to be

19. so cruel and indifferent to the exposure of inmates to a seriouslyy

20. Communicable Disease, although empty dorms and designated quarannteen

21. areas were available and at his disposal for the reasonablility of

22. alternative. See Ex. E. Positive Sars Test.

23. Trent Allen, was Chief Deputy Warden and one of the four face to face

24. briefees who failed to reasonably enforce CME orders regarding movement,

25. failed to make it stop, and who conspired to hide his culpability by

26. answering the Grievance #000000074630 so vaguely as to avoid culpability

27. enforcement, similar to obstruction of justice. And is being sued in his

28. individual capacity, for his inaction and failure to report intentional

1. exposing inmates to Covid-19, and failure to make it stop, to further
2. the conspiracey, of conditions of confinement deprivations, related to
3. exposure to seriously ommunicable disease
4.    John/Jane Doe A.O.D. for the 12-2-20 to 12-9-20 duty cycle, and his
5. failure to notify, correct, or report special circumstances in the 4
6. person face to face briefing on 12-09-20, by 5p.m., what needed to
7. be done about the mass outbreak of Dec. 9th 2020, what actually was being
8. done about it, and what should've been happening, sued in his individ. cap.
9.    E. Spangler, the A.O.D. from 12-9-20 to 12-16-20, the Administrative
10. Officer of the Day coming, at the 4 person "face to face briefing"
11. where special circumstances are discussed, including what to do about
12. the 62 man covid-19 out break ôf 12-9-20, only hours earlier, and
13. should have discussed recent moves, whether to continue them, or stop
14. them and report them, his failure to act in way to make moves stop,(the
15. absenceoof any of the 4 face to face briefees reporting the moves, or
16. trying to put a stop to them, links a meeting of the minds and a similar
17. knowledge of end result and/or plan. A requisite for conspiracey)
18. is being sued in his individual capacity, (empty dorms were available)
19.    Katie Brown the Chief Medical executive, failed to report the deliberate
20. disobeying of her order, since the day of the order;by warden, captain
21. lieutenant, etcetra.A.O.D. Watch commander sargeant, and is being sued
22. in her individual capacity, for failure to report crime against humanity
23. deliberate exposure of inmates to Covid-19 in a pre-covid vaccine world
24. and with available space to use instead!Comploetely empty dorms ...
25.    Jon/Jane Doe, watch Commander for Fac. B, for his failure to make 12/15/20
26. the moves, stop as Medical requested, and knowing the moves were from
27. infected dorms to noninfected dorms!!!  Victory /and Ex. Declaration of  Gonzalez
28. with empty dorms available; and being sued in her individual Capacity.

1. Jon/Jane Doe Lieutenant, for failing to make the exposing moves stop,

2. failing to follow Chief Medical Executive order to not make nonessential

3. nonemergent moves, approving them often and numerous amounts straight

4. from quaranteen. (with available empty dorms as alternative that was

5. humane at least.) and is being sued in his individual capacity.

6. Sgt. Martinez, for Fac. B/ on 12-15-20, at Sierra Conservation Center

7. is being sued in his individual capacity, for conducting the moves of

8. 12-15-20,(exhibit Declaration of Gonzalez), hearing the dorm 69 pleas

9. to not be exposed to Covid-19, did not register that you had empty

10. dorms to your disposal, instead of risking everyones life in dorm #69

11. including petitioner, you made Ron Davis Happy to gain reception space

12. and packed dorm #69 full with the 4 inmates from 51 and 53 both on

13. DPSR exposure list! or failing to report the upper admins failures

14. whether deliberate or accidental, these inmates were pleading for their

15. lives as was I, and you threatened them for 1st ammendment exercise,

16. me included an act of treason against our constitution and your own oath.

17. /// Chief Medical Officer Katie Brown announced a medical need to "Not

18. make moves on Fac. B dorm living." Prison Officals were deliberately

19. Indifferent to that Medically Announced Need and instead, conducted "mass"

20. moves, in this case directly from two of the 14 identified as containing

21. covid. Sufficiently Serious.

22. Because there were "Empty dorms" available and designated Quaranteen

23. Spaces, Prison Officals, failed to take reasonable measures to abate

24. "Exposure to Covid_19 Risk,

25. The placement of inmates in these circumstances combined with the poor

26. ventilation in dorms and 540 sq. ft. for 32 people to breathe in, paints

27. a one lunged unit that needs to be quaranteend, if humanity is cared about

28. Prison Officials were subjectively aware of the risk, in making moves

1. from the 14 dorms, identified on PSR, signed by warden, Administrator

2. of the day, and Ron Davis, the face to face briefing between, Warden,

3. A.O.D., (coming and going), and Chief Deputy Warden, occurred on day

4. Chief Medical Executive Medical need to not make moves was announced.

5. That face to face briefing where special circumstances abouut prison

6. administration needs to be met, are spoken of. "Did you guys read the

7. P.S.R. today?"    "Yeah, I heard medical say we cant make moves."

8. "Only essential and Emergent." "How can we make moves for the reception

9. on "D" section by January?  "We Can move the inmates toward E and F section

10. and just start packing them." (lines 6 from "Did..." to line 10 "...

11. packing them." , are just dialogue petitioner believes occurred.)

12.    It is upon petitioner's beilief, the reason why empty dorms were

13. not tutelized, was to keep and make more, reception Center space.

14.    This profit over humanity that resulted in 99.9 % Facility B at

15. Sierra Conservation Center inmates infected ratio, is the result of

16. unreasonable application of Medical Chief Executive orders to not

17. make moves unless essential/emergent, and the failure of anyone

18. reporting the inhumane moves that occurred for 6 days after the

19. moves began, when petitioners dorm begged that the four not get moved

20. in the dorm, was unreasonable application of order, no one had tested

21. positive yet, in dorm #69, but moves were being made into there.

22. ///

23.    I, Joseph Marsala, declare under penalty of perjury, that the aforem

24. entioned facts are true and correct, and that referred to his beilief,

25. petitioner decares that he areally believes that too, so help me God.

26.

27. Date: 9/28/20

28.

Joseph Marsala

3(6)

**CLAIM II**

*N/A*

1.   State the constitutional or other federal civil right that was violated: _____

2.   **Claim II.** Identify the issue involved. Check **only one**. State additional issues in separate claims.
     ☐ Basic necessities    ☐ Mail    ☐ Access to the court    ☐ Medical care
     ☐ Disciplinary proceedings    ☐ Property    ☐ Exercise of religion    ☐ Retaliation
     ☐ Excessive force by an officer    ☐ Threat to safety ☐ Other: _____.

3.   **Supporting Facts.** State as briefly as possible the FACTS supporting Claim II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

*N/A*

4.   **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

5.   **Administrative Remedies.**
     a.   Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?    *N/A*    ☐ Yes  ☒ No
     b.   Did you submit a request for administrative relief on Claim II?    ☒ Yes  ☐ No
     c.   Did you appeal your request for relief on Claim II to the highest level?    ☒ Yes  ☐ No
     d.   If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. ___Exhibted in Er B_____

4

## CLAIM III

1. State the constitutional or other federal civil right that was violated: _____ *N/A* _____

2. **Claim III.** Identify the issue involved. Check **only one.** State additional issues in separate claims.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Claim III. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

_____

*N/A*

_____
_____
_____
_____
_____
_____
_____
_____
_____

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

_____
_____

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?    ☐ Yes  ☐ No
   b. Did you submit a request for administrative relief on Claim III?  *N/A*   ☐ Yes  ☐ No
   c. Did you appeal your request for relief on Claim III to the highest level?    ☐ Yes  ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

If you assert more than three Claims, answer the questions listed above for each additional Claim on a separate page.

5

## E.  REQUEST FOR RELIEF

State the relief you are seeking:

2000.00 dollars nominatively; 25000.00 dollars compensatorily and punitively for 2.5 million dollars long term covid after effects

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  8/28/23
DATE

SIGNATURE OF PLAINTIFF

N/A

(Name and title of paralegal, legal assistant, or
other person who helped prepare this complaint)

(Signature of attorney, if any)

N/A

(Attorney's address & telephone number)

## ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form.  If you need more space you may attach more pages, but you are strongly encouraged to limit your complaint to twenty-five pages.  If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages. Remember, there is no need to attach exhibits to your complaint.

# EXHIBIT



ATTACHMENT A

STATE OF CALIFORNIA
CDCR 3022A (REV. 03/14)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

# DAILY PROGRAM STATUS REPORT PART A – PLAN OF OPERATION / STAFF & INMATE NOTIFICATION

*Describe only this reporting period's specific Plan of Operation*
*Upon completion, distribute to ensure all staff and inmate awareness*

| PLAN EFFECTIVE FOR DATE: | INSTITUTION: | PROGRAM STATUS NUMBER: |
|---|---|---|
| December 19, 2020 | Sierra Conservation Center | SCC-FCOP-20-033 |

| ☐ NORMAL PROGRAM | ☒ MODIFIED PROGRAM | ☐ LOCKDOWN | ☐ STATE OF EMERGENCY ☐ Approved ☐ Disapproved |
|---|---|---|---|
| ☐ INITIAL | | ☒ UPDATE | ☐ CLOSURE |

## RELATED INFORMATION (CHECK ALL THAT APPLY)

| AREA AFFECTED | | INMATES AFFECTED | REASON |
|---|---|---|---|
| ☒ INSTITUTION: | SCC | ☒ ALL | ☐ BATTERY |
| | | ☐ SECURITY THREAT GROUP(S): | |
| ☒ FACILITY: | A, B, & C | | ☐ DEATH |
| ☒ HOUSING UNIT: | All | | ☐ RIOT / DISTURBANCE |
| ☒ HOUSING LEVEL: | I & II/NDPF & III/SNY | | ☐ THREATS |
| ☒ OTHER: Isolation | 25, 27, 28, 30, 39-52, & Bldg. 6. Bldg. 2: Cell 124, 136, 138 & 141. | ☒ OTHER: Isolation: 25, 27, 28, 30, 39-52, & Bldg. 6. Bldg. 2: Cell 124, 136, 138 & 141. | ☐ CONTINUING VIOLENCE |
| Quarantine: 01, 02, 03, 05, 06, 08, 09, 10, 12, 13, 14, 15, 16, 18, 19, 20, 21, 23, 34, Bldg. 3, & Bldg. 2: Cell 140, 234, and 235. | | Quarantine: Facility B (01, 02, 03, 05, 06, 08, 09, 10, 12, 13, 14, 15, 16, 18, 19, 20, 21, 23, 34, Bldg. 3, & Bldg. 2: Cell 140, 234 and 235) | ☒ MEDICAL QUARANTINE |
| | | | ☒ OTHER |

| MOVEMENT | | WORKERS | | DAYROOM |
|---|---|---|---|---|
| ☐ NORMAL | | ☐ NORMAL | | ☐ NORMAL |
| ☒ ESCORT ALL MOVEMENT | | ☐ CRITICAL WORKERS ONLY | | ☐ NO DAYROOM |
| ☐ CLOTHED BODY SEARCH PRIOR TO ESCORT | | ☐ CULINARY | | ☒ MODIFIED: See page 2 |
| ☐ IN RESTRAINTS | | ☐ CLERKS | | |
| ☐ CONTROLLED MOVEMENT | | ☐ VOCATION/EDUCATION | | RECREATION |
| ☒ OTHER: In groups with other like quarantined inmates. | | ☐ CANTEEN | | ☐ NORMAL |
| | | ☐ CLOTHING ROOM | | ☐ NO RECREATIONAL ACTIVITIES |
| FEEDING | | ☐ RESTRICTED WORK PROGRAM | | ☒ MODIFIED:  See page 2 |
| ☐ NORMAL | | ☐ PORTERS | | |
| ☒ CELL FEEDING | | ☐ NO INMATE WORKERS | | CANTEEN |
| ☒ CONTROLLED FEEDING IN DINING ROOM | | ☒ OTHER: See page 2 | | ☐ NORMAL |
| ☐ HOUSING UNIT | | SHOWERS | | ☐ NO CANTEEN |
| ☐ DORM / POD AT A TIME | | ☒ NORMAL disinfecting between each use | | ☒ MODIFIED: See page 2 |
| ☐ TIER AT A TIME | | ☐ ESCORTED | | PACKAGES |
| ☐ HOUSING UNIT SECTION AT A TIME | | ☐ ONE INMATE PER SHOWER – OWN TIER | | ☐ NORMAL |
| ☐ SACK MEAL BREAKFAST: | | ☐ CELL PARTNERS TOGETHER – OWN TIER | | ☐ NO PACKAGES |
| ☒ SACK MEAL LUNCH | | ☐ DORM SHOWERING BY GROUP | | ☒ MODIFIED: See page 2 |
| ☐ SACK MEAL DINNER: | | ☐ CRITICAL WORKERS ONLY | | |
| DUCATS | | ☐ NO SHOWERS | | PHONE CALLS |
| ☐ NORMAL | | HEALTH CARE SERVICES | | ☐ NORMAL |
| ☐ CLASSIFICATION DUCATS | | ☐ NORMAL PROGRAM | | ☐ NO PHONE CALLS |
| ☒ PRIORITY DUCATS ONLY | | ☒ PRIORITY DUCATS ONLY See page 2 | | ☐ LEGAL CALLS |
| ☒ OTHER: URGENT/EMERGENT ONLY | | ☒ CONDUCT ROUNDS IN UNITS See page 2 | | ☒ MODIFIED: See page 2 |
| VISITING | | ☒ ESCORTED TO TREATMENT AREA See page 2 | | RELIGIOUS SERVICES |
| ☐ NORMAL VISITING | | ☐ EMERGENCY ONLY | | ☐ NORMAL |
| ☐ NON-CONTACT ONLY | | ☒ MEDICATION DISTRIBUTION See page 2 | | ☒ CHAPLAINS CONDUCT ROUNDS |
| ☐ NO GENERAL VISITING/FAMILY VISITING | | LAW LIBRARY | | ☐ MODIFIED: |
| ☐ LEGAL  VISITING | | ☐ NORMAL | | |
| ☒ OTHER: See page 2, BPH will continue with attorney contacts as required. | | ☐ PLU  ☐ GLU Quarantine/Isolated inmates will access via paging (answering requests through institutional mail) | | |

ATTACHMENT A

STATE OF CALIFORNIA
CDCR 3022A (REV. 03/14)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

REMARKS: Building 3 on Facility C is the designated housing area for inmates placed on quarantine/isolation for COVID-19 /ILI symptoms or for contact precautionary reasons.

On Thursday, November 26, 2020, the California Department of Corrections and Rehabilitation's Director, Division of Adult Institutions advised all institutions to implement a COVID-19 mandatory 14-day modified program for all inmates to reduce staff and inmate exposure to the Coronavirus (COVID-19).

On Friday, December 04, 2020, SCC medical received positive test results for COVID-19 from an inmate housed in Dorm 61. The inmate was placed on isolation in Building 6 and Dorm 61 was placed on quarantine.

On Saturday, December 05, 2020, SCC medical received positive test results for COVID-19 from an inmate housed in Dorm 57. The inmate was placed on isolation in Building 6 and Dorm 57 was placed on quarantine.

On Sunday, December 06, 2020, SCC medical received positive COVID-19 test results for two inmates housed on Facility B. One was housed in Dorm 59 and the other in Dorm 55. The inmates were placed on isolation in Building 6 and Dorm 59 and 55 were placed on quarantine. Due to the amount of positive cases, SCC's Chief Medical Executive placed Facility B on movement restriction with testing ordered for all inmates. Only essential movement will take place on Facility B. Dorm 32 and 36 were placed on quarantine per the medical movement matrix in anticipation of transferring to conservation camps.

Additionally, SCC received positive results for four inmates on Facility B. The identified inmates were housed in the following dorms: one from Dorm 55, two from Dorm 61, and one from dorm 60. The inmates were placed on isolation in Building 6. Dorm 55 and 61 were already on quarantine for positive cases and were tested. Dorm 60 was placed on quarantine.

On Monday, December 07, 2020, the COVID-19 mandatory 14-day modified program was extended through December 16, 2020.

On Tuesday, December 08, 2020, SCC medical received positive test results for 5 inmate from various dorms on Facility B. The dorms were already on quarantine. Those identified inmates were moved to Building 6.

On Wednesday, December 09, 2020, SCC medical received positive swab test results for 62 inmates from various dorms on Facility B. Positive results were received from the following dorms: 39, 41, 46, 47, 51, 52, 53, 62, 64, 66, 71, 74, 75, & 76. Based on the amount of positive results, all of Facility B was placed on Medical Quarantine. All dorms are affected. Dorm 39, 40, 41, & 42 have been identified as isolation space to house COVID-19 positive inmates.

On Thursday, December 10, 2020, SCC's Chief Medical Executive received positive test results for 2 inmates. One was housed in Dorm 20 and the other in Dorm 23. The inmates were moved to isolation and Dorm 20 and 23 were placed on Quarantine. Additionally Dorm 03 and 14 were placed on quarantine for suspected cases.

On Friday, December 11, 2020, SCC's Chief Medical Executive received positive test results for 6 inmates. 4 from Dorm 20, 1 from Dorm 15, and 1 from Dorm 55. Dorm 20 and 55 will remain on quarantine. Dorm 15 was placed on quarantine. Additionally, Dorm 25 and 27 were identified as isolation space for positive Covid-19 inmates from Facility A. Dorm 25 and 27 were added to the PSR.

SCC's Chief Medical Executive received positive test results for an inmate in Dorm 19. The inmate will be moved to an isolation dorm on Facility A and Dorm 19 was placed on quarantine.

SCC's Chief Medical Executive received positive COVID-19 test results for 23 inmates housed at Mount Home Conservation Camp CC#10. The inmates were placed on isolation and transported back to SCC. The inmates were housed in Dorm 43 and 45. Dorm 43 and 45 were added as isolation dorms. NO OTHER INMATES WILL BE HOUSED IN DORM 43 AND 45 OTHER THAN COVID-19 POSITIVE INMATES FROM MOUNTAIN HOME CONSERVATION CAMP.

On Saturday, December 12, 2020, SCC Medical notified the Watch Commander of 13 inmates who tested positive for COVID-19 from various dorms on Facility A, B, and C. Those inmates were moved to isolation areas. Bldg. 2: Cell 138 & 141 were placed on isolation and Bldg. 2: Cell 140 was placed on quarantine.

On Monday, December 14, 2020, SCC Medical received a significant amount of positive COVID-19 test results for inmates on Facility B. The identified inmates were moved to isolation dorms. Dorm 46, 47, 48, 49, and 50 were placed on isolation.

On Tuesday, December 15, 2020, Dorm 51 and 52 were added as isolation dorms on Facility B. The COVID-19 mandatory 14-day modified program was extended through December 28, 2020.

ATTACHMENT A

STATE OF CALIFORNIA
CDCR 3022A (REV. 03/14)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

On Wednesday, December 16, 2020, inmates from the following dorms tested positive for COVID-19: 01, 06, 13, 21, 23, 15, and 66. The inmates were moved to isolation and Dorm 01, 06, 13, 21 were placed on quarantine. Dorm 15, 23, and 66 will continue their quarantine. Dorm 28 was added as isolation space for inmate positives from Oak Glen, NO OTHER INMATES WILL BE HOUSED IN DORM 28 OTHER THAN INMATES FROM OAK GLEN.

On Thursday, December 17, 2020, inmates from the following dorms tested positive for COVID-19: 10, 18, and 34. The inmates were moved to isolation and Dorm 10, 18, and 34 were placed on quarantine. Dorm 26 was added as isolation space for COVID-19 positive inmates.

On Friday, December 18, 2020, inmates from the following dorms tested positive for COVID-19: 02, 05, 08, 09, 12, and 16. The inmates were moved to isolation and Dorm 02, 05, 08, 09, 12 and 16 were placed on quarantine. Additionally, inmates tested positive in Building 2, 3, and 4. The inmates were moved to isolation and cellmates were placed on quarantine. Building 2 cells 124 and 136 were placed on isolation. Building 2 cells 234 and 235 were placed on quarantine.

INMATES AFFECTED: All. Isolation: (25, 26, 27, 28, 30, 39-52, & Bldg. 6, Bldg. 2: Cell 124, 136, 138 & 141. Quarantine: Facility B (01, 02, 03, 05, 06, 08, 09, 10, 12, 13, 14, 15, 16, 18, 19, 20, 21, 23, 34, Bldg. 3, & Bldg. 2: Cell 140, 234 and 235)

MOVEMENT: Movement will be via direct visual observation maintaining increased social distancing unless security would dictate otherwise (i.e. Administrative Segregation Unit placement). Any movement of affected inmates outside their housing area will consist of infectious disease best practices being followed. Inmates will wear masks during movement. Staff will wear approved PPE while in contact with affected inmates. Priority Ducats to include BPH hearings and parole planning will run as scheduled. If it becomes necessary for movement to occur outside of Building 3, it shall be done under visual escort with no direct contact with Facility C inmates.

Transfer and inmate movement: Only essential moves approved via the movement matrix and via Population Management Unit in conjunction with Health Care Population Oversight Program.

FEEDING: All of Facility B dorms will be dorm fed. Bldg. 3 & Bldg. 6 will be cell/dorm fed. Feeding on Facility A will be controlled, maintaining social distancing between dorms in the dining halls and disinfecting tables between each use. Feeding on Facility C will be one building at a time, maintaining social distancing and disinfecting tables between each use. Quarantined/isolated inmates in Building 2 will be cell fed.

VISITING: Video visiting is permitted for Facility A non-quarantined/isolated inmates only. Facility B is not permitted video visiting. Facility C is permitted video visiting except inmates on isolation/quarantine. Quarantined/isolated inmates in Building 2 are not permitted video visits.

WORKERS: Facility A and C - Critical and porters only. PFT, FFT, HFM and CRWD workers are permitted to work while maintaining social distancing and disinfecting work areas. All workers shall use appropriate Personal Protective Equipment (PPE) at all times. Porters assigned with quarantined dorms. Facility B quarantine dorms are permitted to work. Porters assigned in various buildings on Facility C are permitted to clean and sanitize Building 3 following all PPE guidelines and social distancing. Quarantined/isolated inmates in Building 2 are not permitted to work. Facility B – No critical workers from Facility B. Porters assigned within dorms are permitted to work.

DAYROOM: Normal program in dorms. Facility C numbers need to be reduced to allow for increased social distancing which may result in no dayroom activities if unable to maintain social distancing numbers to accommodate showers and phones. Isolated/quarantined inmates in Building 2 are not permitted dayroom.

RECREATION/YARD: Facility A non-quarantined inmates are permitted recreation/yard. This will be accomplished by maintaining social distancing and reducing the number of dorms released out for yard at a time. Facility A quarantine/isolation dorms are permitted recreation/yard. This will be accomplished at the facility Lieutenant's discretion. Isolation dorms will not be released for recreation with quarantined dorms. Facility B quarantine/isolation dorms are permitted recreation. This will be accomplished at the facility Lieutenant's discretion. Isolation dorms will not be released for recreation with quarantined dorms. Facility C non-quarantined inmates are permitted recreation/yard. This will be accomplished by maintaining social distancing and allowing only one building out for yard at a time. This will be accomplished at the Facility C Lieutenants discretion. Quarantined buildings on Facility C are NOT permitted recreation. Isolated/quarantined inmates in Building 2 are NOT permitted recreation.

CANTEEN: Canteen is permitted for non-quarantined inmates. If unable to accommodate during scheduled yard time, facilitate delivery method. Canteen is permitted for inmates on isolation/quarantine at half draw limit. Quarantined inmates in Building 3 who have completed Unit Classification Committee at Sierra Conservation Center are eligible for canteen draw within their privilege group. Inmate eligibility will be based on the draw schedule. Canteen will be delivered to inmates in quarantine/isolation dorms. Canteen for isolated/quarantined inmates in Building 2 is permitted. Canteen will be delivered to inmates in Building 2.

PACKAGES: Packages are permitted for inmates in isolation/quarantine and the rest of the population. This will be accomplished at the discretion of each Facility Lieutenant one dorm at a time per a designated schedule. Quarantined/isolated inmates in Building 2 are NOT permitted packages.

PHONE CALLS: Phone calls are permitted for non-quarantined inmates. Disinfect between each use. Phone calls are permitted for inmates on quarantine/isolation. This will be accomplished one dorm at a time disinfecting phones after each use. Quarantine inmates in Building 3 who have completed Unit Classification Committee at Sierra Conservation Center are permitted phone calls. Building 6 isolated inmates are permitted phone calls disinfecting after each use. Quarantined/isolated inmates in Building 2 are NOT permitted phone calls.

ATTACHMENT A

DEPARTMENT OF CORRECTIONS AND REHABILITATION

STATE OF CALIFORNIA
CDCR 3022A (REV. 03/14)

| HEALTH CARE SERVICES: Healthcare appointments for all Facilities will be URGENT/EMERGENT ONLY. Access to care will be at the discretion of the Medical Lieutenant. Medical staff will conduct daily rounds in quarantined areas noting visits in the unit logbook. Health Care Services Request Forms (CDCR 7362) will be collected by medical staff during daily rounds. If a need arises where a QUARANTINE inmate needs to report to Medical for care, they will be under visual escort by Correctional Officers. Inmates will wear surgical masks during movement. Correctional Officers will wear approved PPE while in contact with affected inmates. The designated area for URGENT/EMERGENT care for Facility C Building 3 QUARANTINED inmates is Facility C medical. The designated area for URGENT/EMERGENT care for Facility C Building 3 ISOLATED inmates will be via cell front. The designated area for URGENT/EMERGENT care for Facility A and B QUARANTINED inmates is the A/B GYM. Every effort should be made to maintain separation of Facility A and B inmates while in the Gymnasium. The designated area for URGENT/EMERGENT care for Facility C Building 6 ISOLATED inmates will be in Building 6. The designated care for URGENT/EMERGENT care for Building 2 ISOLATION/QUARANTINED inmates will be via cell front. The rest of the population not in a quarantine unit will be permitted to drop off Health Care Services Request Forms (CDCR 7362) during feeding. Medication/Insulin distribution will continue as normal with an emphasis on social distancing. |
|---|

| REVIEWED BY:          DATE:12/19/20 | NAME / SIGNATURE (WARDEN)DATE:12/19/20 | NAME/SIGNATURE (ASSOCIATE DIRECTOR)          DATE: (REQUIRED FOR INITIAL, CLOSURE, & STATE OF EMERGENCY) |
|---|---|---|
| R. JAUREGUI     *R.Jauregui*  Correctional Lieutenant | I. RAMIREZ  Administrative Officer-Of-The-Day | R. DAVIS  Associate Director |

ATTACHMENT A

STATE OF CALIFORNIA
CDCR 3022A (REV. 03/14)

*No listing of Dorms 51 and 53*
*Isolation on this P.S.R. But*
*See P.S.R. of 12/22/2020; Positive found on 12/6/20*

DEPARTMENT OF CORRECTIONS AND REHABILITATION

# DAILY PROGRAM STATUS REPORT PART A – PLAN OF OPERATION / STAFF & INMATE NOTIFICATION

*Describe only this reporting period's specific Plan of Operation*
*Upon completion, distribute to ensure all staff and inmate awareness*

| PLAN EFFECTIVE FOR DATE: December 12, 2020 | INSTITUTION: Sierra Conservation Center | PROGRAM STATUS NUMBER: SCC-FCOP-20-033 |
|---|---|---|

| ☐ NORMAL PROGRAM | ☒ MODIFIED PROGRAM | ☐ LOCKDOWN | ☐ STATE OF EMERGENCY ☐ Approved  ☐ Disapproved |
|---|---|---|---|

| ☐ INITIAL | ☒ UPDATE | ☐ CLOSURE |
|---|---|---|

### RELATED INFORMATION (CHECK ALL THAT APPLY)

| AREA AFFECTED | INMATES AFFECTED | REASON |
|---|---|---|
| ☒ INSTITUTION: SCC | ☒ ALL | ☐ BATTERY |
| | ☐ SECURITY THREAT GROUP(S): | |
| ☒ FACILITY: A, B, & C | | ☐ DEATH |
| ☒ HOUSING UNIT: All | | ☐ RIOT / DISTURBANCE |
| ☒ HOUSING LEVEL: I & II/NDPF & III/SNY | | ☐ THREATS |
| ☒ OTHER: Isolation Dorm 25, 27, 39, 40, 41, 42, 43, 45, & Bldg. 6. | ☒ OTHER: Isolation: Dorm 25, 27, 39, 40, 41, 42, 43, 45, & Bldg. 6. | ☐ CONTINUING VIOLENCE |
| Quarantine: Dorm 03, 14, 15, 19, 20, 23, 55, & Bld. 3 | Quarantine: Facility B (Dorm 03, 14, 15, 19, 20, 23, & Bldg. 3) | ☒ MEDICAL QUARANTINE |
| Quarantine influenza: Dorm 28 | Quarantine influenza: Dorm 28 | ☒ OTHER |

| MOVEMENT | WORKERS | DAYROOM |
|---|---|---|
| ☐ NORMAL | ☐ NORMAL | ☐ NORMAL |
| ☒ ESCORT ALL MOVEMENT | ☐ CRITICAL WORKERS ONLY | ☐ NO DAYROOM |
| ☐ CLOTHED BODY SEARCH PRIOR TO ESCORT | ☐ CULINARY | ☒ MODIFIED: See page 2 |
| ☐ IN RESTRAINTS | ☐ CLERKS | |
| ☐ CONTROLLED MOVEMENT | ☐ VOCATION/EDUCATION | RECREATION |
| ☒ OTHER: In groups with other like quarantined inmates. | ☐ CANTEEN | ☐ NORMAL |
| | ☐ CLOTHING ROOM | ☐ NO RECREATIONAL ACTIVITIES |
| FEEDING | ☐ RESTRICTED WORK PROGRAM | ☒ MODIFIED: See page 2 |
| ☐ NORMAL | ☐ PORTERS | |
| ☒ CELL FEEDING | ☐ NO INMATE WORKERS | CANTEEN |
| ☒ CONTROLLED FEEDING IN DINING ROOM | ☒ OTHER: See page 2 | ☐ NORMAL |
| ☐ HOUSING UNIT | SHOWERS | ☐ NO CANTEEN |
| ☐ DORM / POD AT A TIME | ☒ NORMAL disinfecting between each use | ☒ MODIFIED: See page 2 |
| ☐ TIER AT A TIME | ☐ ESCORTED | PACKAGES |
| ☐ HOUSING UNIT SECTION AT A TIME | ☐ ONE INMATE PER SHOWER – OWN TIER | ☐ NORMAL |
| ☐ SACK MEAL BREAKFAST: | ☐ CELL PARTNERS TOGETHER – OWN TIER | ☐ NO PACKAGES |
| ☒ SACK MEAL LUNCH | ☐ DORM SHOWERING BY GROUP | ☒ MODIFIED: See page 2 |
| ☐ SACK MEAL DINNER: | ☐ CRITICAL WORKERS ONLY | |
| DUCATS | ☐ NO SHOWERS | PHONE CALLS |
| ☐ NORMAL | HEALTH CARE SERVICES | ☐ NORMAL |
| ☐ CLASSIFICATION DUCATS | ☐ NORMAL PROGRAM | ☐ NO PHONE CALLS |
| ☒ PRIORITY DUCATS ONLY | ☒ PRIORITY DUCATS ONLY See page 2 | ☐ LEGAL CALLS |
| ☒ OTHER: URGENT/EMERGENT ONLY | ☒ CONDUCT ROUNDS IN UNITS See page 2 | ☒ MODIFIED: See page 2 |
| | ☒ ESCORTED TO TREATMENT AREA See page 2 | |
| VISITING | | RELIGIOUS SERVICES |
| ☐ NORMAL VISITING | ☐ EMERGENCY ONLY | ☐ NORMAL |
| ☐ NON-CONTACT ONLY | ☒ MEDICATION DISTRIBUTION  See page 2 | ☒ CHAPLAINS CONDUCT ROUNDS |
| ☐ NO GENERAL VISITING/FAMILY VISITING | LAW LIBRARY | ☐ MODIFIED: |
| ☐ LEGAL VISITING | ☐ NORMAL | |
| ☒ OTHER: See page 2. BPH will continue with attorney contacts as required. | ☒ PLU  ☐ GLU | |

ATTACHMENT A

DEPARTMENT OF CORRECTIONS AND REHABILITATION

STATE OF CALIFORNIA
CDCR 3022A (REV. 03/14)

REMARKS: Building 3 on Facility C is the designated housing area for inmates placed on quarantine/isolation for COVID-19 /ILI symptoms or for contact precautionary reasons.

On November 24, 2020, SCC's Chief Medical Executive confirmed that an inmate housed in Dorm 72 received a positive COVID-19 test. The inmate was placed in isolation in Building 6. Building 6 was activated and placed on quarantine. Dorm 72 was placed on quarantine.

On Thursday, November 26, 2020, the California Department of Corrections and Rehabilitation's Director, Division of Adult Institutions advised all institutions to implement a COVID-19 mandatory 14-day modified program for all inmates to reduce staff and inmate exposure to the Coronavirus (COVID-19).

On Wednesday, December 02, 2020, Dorm 31, 33, 34, and 38 were placed on quarantine per the medical movement matrix in anticipation of transferring to conservation camps.

On Friday, December 04, 2020, SCC medical received positive test results for COVID-19 from an inmate housed in Dorm 61. The inmate was placed on isolation in Building 6 and Dorm 61 was placed on quarantine.

On Saturday, December 05, 2020, SCC medical received positive test results for COVID-19 from an inmate housed in Dorm 57. The inmate was placed on isolation in Building 6 and Dorm 57 was placed on quarantine.



On Sunday, December 06, 2020, SCC medical received positive COVID-19 test results for two inmates housed on Facility B. One was housed in Dorm 59 and the other in Dorm 55. The inmates were placed on isolation in Building 6 and Dorm 59 and 55 were placed on quarantine. Due to the amount of positive cases, SCC's Chief Medical Executive placed Facility B on movement restriction with testing ordered for all inmates. Only essential movement will take place on Facility B. Dorm 32 and 36 were placed on quarantine per the medical movement matrix in anticipation of transferring to conservation camps.

Additionally, SCC received positive results for four inmates on Facility B. The identified inmates were housed in the following dorms: one from Dorm 55, two from Dorm 61, and one from dorm 60. The inmates were placed on isolation in Building 6. Dorm 55 and 61 were already on quarantine for positive cases and were tested. Dorm 60 was placed on quarantine.

On Tuesday, December 08, 2020, SCC medical received positive test results for 5 inmate from various dorms on Facility B. The dorms were already on quarantine. Those identified inmates were moved to Building 6.



On Wednesday, December 09, 2020, SCC medical received positive swab test results for 62 inmates from various dorms on Facility B. Positive results were received from the following dorms: 39, 41, 46, 47, 51, 52, 53, 62, 64, 66, 71, 74, 75, & 76. Based on the amount of positive results, all of Facility B was placed on Medical Quarantine. All dorms are affected. Dorm 39, 40, 41, & 42 have been identified as isolation space to house COVID-19 positive inmates.

On Thursday, December 10, 2020, SCC's Chief Medical Executive received positive test results for 2 inmates. One was housed in Dorm 20 and the other in Dorm 23. The inmates were moved to isolation and Dorm 20 and 23 were placed on Quarantine. Additionally Dorm 03 and 14 were placed on quarantine for suspected cases.

On Friday, December 11, 2020, SCC's Chief Medical Executive received positive test results for 6 inmates. 4 from Dorm 20, 1 from Dorm 15, and 1 from Dorm 55. Dorm 20 and 55 will remain on quarantine. Dorm 15 was placed on quarantine. Additionally, Dorm 25 and 27 were identified as isolation space for positive Covid-19 inmates from Facility A and were added to the PSR. Dorm 28 was added as an isolation space for influenza positive inmates only NOT positive COVID-19 inmates.

SCC's Chief Medical Executive received positive test results for an inmate in Dorm 19. The inmate will be moved to an isolation dorm on Facility A and Dorm 19 was placed on quarantine.

SCC's Chief Medical Executive received positive COVID-19 test results for 23 inmates housed at Mount Home Conservation Camp CC#10. The inmates were placed on isolation and transported back to SCC. The inmates were housed in Dorm 43 and 45. Dorm 43 and 45 were added as isolation dorms. NO OTHER INMATES WILL BE HOUSED IN DORM 43 AND 45 OTHER THAN COVID-19 POSITVE INMATES FROM MOUNTAIN HOME CONSERVATION CAMP.

INMATES AFFECTED: All. (Isolation 25, 27, 39, 40, 41, 42, 43, 45, Bldg. 3, & Bldg. 6) (Quarantine Dorm 03, 14, 15, 19, 20, 23, & Bldg. 3)

MOVEMENT: Movement will be via direct visual observation maintaining increased social distancing unless security would dictate otherwise (i.e. Administrative Segregation Unit placement). Any movement of affected inmates outside their housing area will consist of infectious disease best practices being followed. Inmates will wear masks during movement. Staff will wear approved PPE while in contact with affected inmates. Priority Ducats to include BPH hearings and parole planning will run as scheduled. If it becomes necessary for movement to occur outside of Building 3, it shall be done under visual escort with no direct contact with Facility C inmates.

Transfer and inmate movement: Only essential moves approved via the movement matrix and via Population Management Unit in conjunction with Health Care Population Oversight Program.

FEEDING: All of Facility B dorms will be dorm fed. Bldg. 3 & Bldg. 6 will be cell/dorm fed. Feeding on Facility A will be controlled, maintaining social distancing between dorms in the dining halls and disinfecting tables between each use. Feeding on Facility C will be one building at a time, maintaining social distancing and disinfecting tables between each use.

ATTACHMENT A

STATE OF CALIFORNIA
CDCR 3022A (REV. 03/14)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**VISITING:** Video visiting is permitted for Facility A non-quarantined inmates only. Facility B is not permitted video visiting. Facility C is permitted video visiting except inmate on isolation/quarantine.

**WORKERS:** Facility A and C - Critical and porters only. PFT, FFT, PUPP, HFM and ORWD workers are permitted to work while maintaining social distancing and disinfecting work areas. All workers shall use appropriate Personal Protective Equipment (PPE) at all times. Porters assigned within quarantine dorms are permitted to work. Porters assigned in various buildings on Facility C are permitted to clean and sanitize Building 3 following all PPE guidelines and social distancing.

Facility B – No critical workers from Facility B. Porters assigned within dorms are permitted to work.

**DAYROOM:** Normal program in dorms. Facility C numbers need to be reduced to allow for increased social distancing which may result in no dayroom activities if unable to maintain social distancing numbers to accommodate showers and phones.

**RECREATION/YARD:** Facility A non-quarantined inmates are permitted recreation/yard. This will be accomplished by maintaining social distancing and reducing the number of dorms released out for yard at a time. Facility A quarantine/isolation dorms are permitted recreation/yard. This will be accomplished at the facility Lieutenant's discretion. Isolation dorms will not be released for recreation with quarantined dorms. Facility B quarantine/isolation dorms are permitted recreation. This will be accomplished at the facility Lieutenant's discretion. Isolation dorms will not be released for recreation with quarantined dorms. Facility C non-quarantined inmates are permitted recreation/yard. This will be accomplished by maintaining social distancing and allowing only one building out for yard at a time. Quarantined Dorms/Buildings are permitted recreation/yard. This will be accomplished at the Facility C Lieutenants discretion.

**CANTEEN:** Canteen is permitted for non-quarantined inmates. If unable to accommodate during scheduled yard time, facilitate delivery method. Canteen is permitted for inmates on isolation/quarantine at half draw limit. Quarantined inmates in Building 3 who have completed Unit Classification Committee at Sierra Conservation Center are eligible for canteen draw within their privilege group. Inmate eligibility will be based on the draw schedule. Canteen will be delivered to the quarantined/isolation dorms.

**PACKAGES:** Packages are permitted for non-quarantined inmates. Packages are permitted for inmates in isolation/quarantine. This will be accomplished at the discretion of each Facility Lieutenant one dorm at a time per a designated schedule.

**PHONE CALLS:** Phone calls are permitted for non-quarantined inmates. Disinfect between each use. Phone calls are permitted for inmates on quarantine/isolation. This will be accomplished one dorm at a time disinfecting phones after each use. Quarantine inmates in Building 3 who have completed Unit Classification Committee at Sierra Conservation Center are permitted phone calls. Building 6 isolated inmates are permitted phone calls disinfecting after each use.

**HEALTH CARE SERVICES:** Healthcare appointments for all Facilities will be URGENT/EMERGENT ONLY. Access to care will be at the discretion of the Medical Lieutenant. Medical staff will conduct daily rounds in quarantined areas noting visits in the unit logbook. Health Care Services Request Forms (CDCR 7362) will be collected by medical staff during daily rounds. If a need arises where a QUARANTINE inmate needs to report to Medical for care, they will be under visual escort by Correctional Officers. Inmates will wear surgical masks during movement. Correctional Officers will wear approved PPE while in contact with affected inmates. The designated area for URGENT/EMERGENT care for Facility C Building 3 QUARANTINED inmates is Facility C medical. The designated area for URGENT/EMERGENT care for Facility C Building 3 ISOLATED inmates will be via cell front. The designated area for URGENT/EMERGENT care for Facility A and B QUARANTINED inmates will be in the Gymnasium. Every effort should be made to maintain separation of Facility A and B inmates while in the Gymnasium. The designated one dorm for URGENT/EMERGENT care for Facility C Building 6 ISOLATED inmates will be in Building 6. The rest of the population not in a quarantine unit will be permitted to drop off Health Care Services Request Forms (CDCR 7362) during feeding. Medication/insulin distribution will continue as normal with an emphasis on social distancing.

| REVIEWED BY:    DATE:12/12/20 | NAME / SIGNATURE (WARDEN)DATE:12/12/20 | NAME/SIGNATURE (ASSOCIATE DIRECTOR)    DATE: (REQUIRED FOR INITIAL, CLOSURE, & STATE OF EMERGENCY) |
|---|---|---|
| R. JAUREGUI  *R. Jauregui*  Correctional Lieutenant | E. SPANGLER  Administrative Officer-Of-The-Day | R. DAVIS  Associate Director |



## DECLARATION OF PATRICIO GONZALEZ

On 12-15-20, (in the evening) I was exposed to Covid-19 by Sierra Conservation Center moving four inmates into my dorm (#69) from dorms known to be inhabited by Covid-19 positive inmates.

S.C.C. was even aware of an ambulance escorting an inmate from the very same dorm(s), for complications due to Covid-19, THE SAME DAY OF THE MOVES, that exposed me to Covid-19.

Residents from my dorm, and myself, watched on T.V. how deadly the virus was, and knew as the inmates moving into our dorm, were stacking their property at our front door, that any one of us could die, if they succeeded in moving in.

In an attempt to prevent the moves, residents from our dorm layed in front of the door, forming a human barrier. One inmate was placed into handcuffs and told he was going to the SHU, and the rest of us were told that we would be sent to a yard that would not welcome NDPF inmates there. A threat on all our lives.

There were many completely empty dorms to utelize, instead of placeing our lives in danger, and I still do not know why those dorms were not used.(**moves** made before 12-15-20, created that space)

The entire dorm I lived in, was tested for Covid-19, on the 7th and 11th day of that December, and we were all negative both times, a fact known to S.C.C. by the Daily program Status Reports available to them, and medical recieving those actual test results by FAX, on THE DAY OF THE MOVES.

It was obvious that the Administration knew the inevitable outcome of the moves exposing me to Covid-19, and I would just like to know why my life and 27 others meant so little to prison officals.

I, Patricio Gonzalez, declare under penalty of perjury, that the aforementioned facts are true and correct so help me God.

Date: 9-11-23

Patricio Gonzalez

# EXHIBIT



CALIFORNIA DEPARTMENT *of*
Corrections and Rehabilitation

## CLAIMANT GRIEVANCE CLAIMS DECISION RESPONSE

**Re:** Grievance Claims Decision Response

**Offender Name:** MARSALA, JOSEPH AUGUST
**CDC#:** AF9575

**Date:** 02/05/2021

**Current Location:** SCC-Facility B

**Current Area/Bed:** B 001E2 - 059012L

**Log #:** 000000074630

**Claim #: 001**
**Institution/Parole Region of Origin:** Sierra Conservation Center
**Housing Area/Parole Unit of Origin:**
**Category:** COVID-19

**Facility/Parole District of Origin:** SCC-Facility B

**Sub-Category:** Social Distancing

### I. CLAIM

You state you were exposed to COVID-19 after bed moves were made from quarantined Dorms 51 &amp; 53 to Dorm 69 on December 15, 2020, on Third Watch. You are requesting the names of the person responsible for initiating the bed moves.

### II. RULES AND REFERENCES

#### A. CONTROLLING AUTHORITY

Department Operations Manual, Section 54100.4, Right to Appeal.Memorandum dated May 11, 2020, titled, "COVID-19 Guidance for Daily Program Regarding Social Distancing for Cell of Alternative/Dorm Style Housing of Eight Person Cohorts," signed by Connie Gibson, Director of the Division of Adult Institutions.

#### B. DOCUMENTS CONSIDERED

Grievance Log #74630. Daily Program Status Report Log #SCC-FCOP-20-033.

### III. REASONING AND DECISION

Inmate housing movements are conducted in accordance with directives from COVID-19 Housing Matrix, the Incident Command Post, and Health Care Providers who are tasked with protecting all inmates, staff, and volunteers from exposure to COVID-19. Inmates who have not tested positive for COVID-19, are separated from the inmate population with positive test results. COVID-19 testing for the inmate population is ongoing at this time. Individual test results dictate all inmate bed moves for the safety of everyone at Sierra Conservation Center.

### IV. REMEDY

The COVID-19 Housing Matrix, Incident Command Post and Health Care Providers direct the bed moves.

**Decision: Approved**

After a thorough review of all documents and evidence presented at the Office of Grievances Level, it is the order of the Office of Grievance to APPROVE the claim.

If you are dissatisfied with the decision of this claim, you may file a 602-2, appeal with the California Department of Corrections and Rehabilitation Office of Appeals.

If more than 30 calendar days have passed since the decision was sent to you, and your remedy has not been implemented, you may file a CDCR Form 602 -3, Request to Implement Remedies Form. You must wait until after the 30th day has passed to submit this request.

| Staff Signature | Title | Date/Time |
|---|---|---|
| T. Allen [ALTR002] | CDW | 02/04/2021 |

**Claim #:  002**

**Institution/Parole Region of Origin:** Sierra Conservation Center          **Facility/Parole District of Origin:** SCC-Facility B
**Housing Area/Parole Unit of Origin:**
**Category:**  General Employee Performance          **Sub-Category:**   Other Staff Misconduct - NOS

### I. CLAIM

You state staff are not wearing their facial masks in accordance with current mandates.

### II. RULES AND REFERENCES

#### A. CONTROLLING AUTHORITY

Department Operations Manual, Section 54100.4, Right to Appeal.

#### B. DOCUMENTS CONSIDERED

Grievance Log #074630.

### III. REASONING AND DECISION

Your grievance was reviewed the by the Hiring Authority determined it is a supervisorial matter. You were interviewed on January 25, 2021, regarding your grievance and its content.During the interview, you stated you had originally filed the appeal in December of 2020, but since then staff have improved greatly. You refused to identify staff members you observed not wearing masks or what days it occurred. You stated you fear staff would retaliate if they knew you provided names of those not in compliance with mask-wearing standards. It was reiterated to you the importance of providing staff names so this matter could be further investigated, you continued to refuse to provide staff names; therefore, the interview was concluded.Information obtained during the interview has been documented and processed according to departmental policies and procedures. The interview conducted did not yield supportive information of staff egregiously or purposefully violating departmental policy by not wearing facial masks.

**Decision: Disapproved**

After a thorough review of all documents and evidence presented at the Office of Grievances Level, it is the order of the Office of Grievance to DISAPPROVE the claim.

If you are dissatisfied with the decision of this claim, you may file a 602-2, appeal with the California Department of Corrections and Rehabilitation Office of Appeals.

| Staff Signature | Title | Date/Time |
|---|---|---|
| T. Allen [ALTR002] | CDW | 02/04/2021 |

STATE OF CALIFORNIA
**GRIEVANCE**
CDCR 602-1 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

N

Page 1 of 2

| **STAFF USE ONLY** | Grievance #: CSCCC0001463○ Date Received: JAN 05 2021 |
| | Date Due: |
| | Categories: |

*This is the process to ask for help with a complaint.*

Claimant Name: Marsala, Joseph     CDCR #: AF8575 Current Housing/Parole Unit: 59/15Low

Institution/Facility/Parole Region: Fac. B at Sierra Conservation Center

In order for the Department to understand your complaint, make sure you have answered the following questions:

- *What is the nature of your complaint?*
- *When and where did the complaint occur?*
- *Who was involved?*
- *Which specific people can support your complaint?*
- *Did you try to informally resolve the complaint?*
- *What rule or policy are you relying on to make your complaint?*
- *Are there documents that would be helpful to support your position? List the documents if you do not have them. Please note that documents submitted with this form will not be returned.*
- *What specific action would resolve your complaint?*

- I was exposed to communicable disease when moves were made from Quaranteened Dorms 51 and 53 to Dorm 69 on 12/15/20 - 3rd watch

- I tried to orally grieve that move and was threatened to be sent to a O.P. yard in Violation of Penal Code § 422

- I contracted covid-19 My heartrate is tripping out, my Nose keeps bleeding and this could've been avoided and may get worse

- ▓▓ P.S.R. says that moves are made ONLY in Conjunction with Administration and Health Care Population Oversight Program

- The move was made in a deliberately Indifferent manner and in Violation of 8th amendment Cruel and Unusual Livings Conditions.

- I want those responsible for the moves, for Forcing me to be exposed to the seriously and dangerously Communicative Disease of Covid-19 to be made known to me, So I can hold them accountable for their actions, in a Civil Rights Complaint/Lawsuit.

STATE OF CALIFORNIA
**GRIEVANCE**
CDCR 602-1 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 2 of 2

Helling v. McKinney (1993) 509 U.S. 25, 33

"Prison officials may not be deliberately
indifferent to the exposure of inmates to
a serious communicable disease."

- No masks by 2nd Watch officers for months, though mandated
- No partitions between each 8 men as previously claimed by CDCR
- No staggering of sleeping quarters were enforced, though mandated
- No 14-Day Quarantine/Isolation – after 12/15/20 though mandated
- No sufficient space for physical distancing, though mandated in Ra Ivan Vin Stacch
- No tents used to expand available space although funded to do so.
- No effective Covid-19 leadership resulted in me now being Covid-19 positive

**Reminder:** Please attach all documents in your possession that support your claim(s).

Please note that this form and supporting documents will not be returned to you.

Claimant Signature: _____ Date Signed: 12/24/20

DISTRIBUTION    Original: Claimant's File    Copies: DAI, DAPO, and Claimant

| STAFF USE ONLY | Expedited? ☐ Yes ☐ No | Tracking #: SCCHC 2-1000157 |
|---|---|---|

**Staff Name and Title (Print)** | **Signature** | **Date**

**If you think you have a medical, mental health or dental emergency, notify staff immediately.** If additional space is needed, use Section A of the CDCR 602 HC A Health Care Grievance Attachment. Only one CDCR 602 HC A will be accepted. You must submit this health care grievance to the Health Care Grievance Office for processing. Refer to California Code of Regulations (CCR), Title 15, Chapter 2, Subchapter 2, Article 5 for further guidance with the health care grievance process.

**Do not exceed more than one row of text per line. WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First, MI): Marsala, Joseph | CDCR #: AF9575 | Unit/Cell #: Dorm 59 |
|---|---|---|

**SECTION A:** Explain the applied health care policy, decision, action, condition, or omission that has had a material adverse effect upon your health or welfare for which you seek administrative remedy: No Covid-19 preventive measures utilized permanently - e.g. ① No masks by staff ② No Partitions in dorms, No staggering or sleeping dinettes enforced, ③ No 14-Day Quaranteening of positive/contacted inmates after 12/15/20, ④ No sufficient space for physical Distancing, ⑤ No tents utilized to expand space availability, ⑥ As a result of #4 I am covid-19 positive, bleeding from my nostrils and experiencing chest pain/pressure to my heart, pain in midsection front and back, and who knows what lies ahead from after effects of Covid-19. ⑧ I would like to Know why the moves made on 12/15/20 (made in conjunction with Health Care Population Oversight Program) from where positive Covid-19 inmates had contact with inmates in dorm 51 and 53, were moved to my dorm #69 and effectively spread Covid-19 throughout an otherwise uncontaminated Dorm? and/or why an inmate who recovered from Covid-19 was moved into Dorm 69, knowing he could still be a carrier from another prison? Why was I exposed to a seriously communicable disease? With no concern for my life, I would like to be answered, How much money did it take?

Supporting Documents Attached. Refer to CCR 3999.227 ☑ Yes ☐ No → Program Status Report of 12-12-20 (see H) Dorm 51 and 53 Isolated/Quaranteened

Grievant Signature: _____ Date Submitted: 12/27/20

BY PLACING MY INITIALS IN THIS BOX, I REQUEST TO RECEIVE AN INTERVIEW AT THE INSTITUTIONAL LEVEL. [    ]

| SECTION B: HEALTH CARE GRIEVANCE REVIEW INSTITUTIONAL LEVEL: Staff Use Only | Is a CDCR 602 HC A attached? ☐ Yes ☐ No |
|---|---|

This grievance has been:

☐ Rejected (See attached letter for instruction): Date: _____ Date: _____

☐ Withdrawn (see section E)

☐ Accepted   Assigned To: _____ Title: _____ Date Assigned: _____ Date Due: _____

Interview Conducted? ☐ Yes ☐ No   Date of Interview: _____ Interview Location: _____

Interviewer Name and Title (print): _____ Signature: _____ Date: _____

Reviewing Authority Name and Title (print): _____ Signature: _____ Date: _____

Disposition: See attached letter   ☐ Intervention   ☐ No Intervention

HCGO Use Only: Date closed and mailed/delivered to grievant: _____

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: |
|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☐ Patient asked questions |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ Patient summed information |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | **Please check one:** |
| ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ☐ Reached |
| ☐ Not Applicable | ☐ Other* | *See chrono/notes |
| 4. Comments: | | |

RECEIVED SCC MAR 1 1 2021

COMPLETE SCC MAY 0 3 2021

STAFF USE ONLY HCGO MAY 0 3 2021

COMPLETED HCCAB JUL 2 8 2021

RECEIVED HCCAB MAY 1 3 2021

STATE OF CALIFORNIA
HEALTH CARE GRIEVANCE
CDCR 602 HC (Rev. 10/18)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 2 of 2

Case 1:22-cv-00843-KES-BAM    Document 31    Filed 10/03/23    Page 31 of 49

Tracking #:

**SECTION C:** Health Care Grievance Appeal. If you are dissatisfied with the Institutional Level Grievance Response, explain the reason below (if more space is needed, use Section C of the CDCR 602 HC A), and submit the entire health care grievance package by mail for Headquarters' (HQ) Level health care grievance appeal review. Mail to: Health Care Correspondence and Appeals Branch, P.O. Box 588500, Elk Grove, CA 95758.

Grievant Signature: | Date Submitted:

**SECTION D:** HEALTH CARE GRIEVANCE APPEAL REVIEW HQ LEVEL: Staff Use Only    Is a CDCR 602 HC A attached? ☐ Yes    ☐ No

This grievance has been:

☐ Rejected (See attached letter for instruction):    Date: _____    Date: _____

☐ Withdrawn (see section E)  ☐ Accepted

☐ Amendment    Date: _____

Interview Conducted?    ☐ Yes  ☐ No    Date of Interview: _____    Interview Location: _____

Interviewer Name and Title (print): _____    Signature: _____    Date: _____

**Disposition:** See attached letter    ☐ Intervention    ☐ No Intervention

*This decision exhausts your administrative remedies.*

**HQ Use Only:** Date closed and mailed/delivered to grievant:

**SECTION E:** Grievant requests to WITHDRAW health care grievance: I request that this health care grievance be withdrawn from further review. Reason:

Grievant Signature: | Date Submitted:

Staff Name and Title (Print): | Signature: | Date:

# STAFF USE ONLY

Distribution: **Original** - Returned to grievant after completed; **Scanned Copy** - Health Care Appeals and Risk Tracking System 2.0 (Do not place in central file or health record)

*Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
HEALTH CARE GRIEVANCE
Case 1:23-cv-00843-KES-BAM    Document 31    Filed 10/03/23    Page 32 of 49
Page 1 of 2
CDCR 602 HC (Rev. 10/18)

| STAFF USE ONLY | Expedited? ☐ Yes ☒ No | Tracking #: |
|---|---|---|

SCC HC 21000157

GLENN SCOTT BARLOW RN _____(Signature) RN_____  03/10/2021

Staff Name and Title (Print)    Signature    Date

If you think you have a medical, mental health or dental emergency, notify staff immediately. If additional space is needed, use Section A of the CDCR 602 HC A Health Care Grievance Attachment. Only one CDCR 602 HC A will be accepted. You must submit this health care grievance to the Health Care Grievance Office for processing. Refer to California Code of Regulations (CCR), Title 15, Chapter 2, Subchapter 2, Article 5 for further guidance with the health care grievance process.

Do not exceed more than one row of text per line. WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First, MI): | CDCR #: | Unit/Cell #: |
|---|---|---|
| Marsaja, Joseph | AF9575 | 59/12 low |

**SECTION A:** Explain the applied health care policy, decision, action, condition, or omission that has had a material adverse effect upon your health or welfare for which you seek administrative remedy.

C. Smith USED a Machination to Prevent Grievance. On 12/27/20, I filed the attached HCG together with a regular 602, for CDCR's involvement with moves made on 12/15/20 in Conjunction with medical's involvement, Hence two 602's one medical and 1 institutional. It is now 3/5/21 and no answer has been made or given. S.C.C. was deliberately Indifferent when they exposed me to a Seriously Communicable Disease, as was Medical staff. And now, Medical Appeals Coordinator is manipulating my only avenue to petition the government for the redress of Grievances. This is a Machination to prevent the PLRA regulation that All prison Conditions Claims must be exhausted, prior to presenting these issues to the Federal Courts. * This is my Appeal for that machination of NOT ANSWERING Attached Grievance. *

Supporting Documents Attached. Refer to CCR 3999.227  ☒ Yes  ☐ No

| Grievant Signature: | Date Submitted: 3/5/21 |
|---|---|

BY PLACING MY INITIALS IN THIS BOX, I REQUEST TO RECEIVE AN INTERVIEW AT THE INSTITUTIONAL LEVEL.  NO

| SECTION B: HEALTH CARE GRIEVANCE REVIEW INSTITUTIONAL LEVEL: Staff Use Only | Is a CDCR 602 HC A attached? ☒ Yes ☐ No |
|---|---|

This grievance is:

☐ Rejected (See attached letter for instruction): Date: _____ Date: _____

☐ Withdrawn (see section E)

☒ Accepted    Assigned To: C. Smith    Title: HCGC    Date Assigned: 3/11/21    Date Due: 5/13/21

Interview Conducted?  ☐ Yes  ☒ No    Date of Interview: _____    Interview Location: _____

Interviewer Name and Title (print): _____    Signature: _____    Date: _____

Reviewing Authority Name and Title (print): G Milliken - CSE(A)    Signature: _____    Date: 5-3-2021

Disposition: See attached letter    ☐ Intervention    ☒ No Intervention

HCGO Use Only: Date closed and mailed/delivered to grievant:  MAY 03 2021

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: |
|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☐ Patient asked questions |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ Patient summed information |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: |
| ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached ☐ Reached |
| ☐ Not Applicable | ☐ Other* | *See chrono/notes |

4. Comments:

RECEIVED SCC MAR 10 2021 HCGO

COMPLETED SCC

MAY 03 2021 STAFF USE ONLY

RECEIVED HCCAB MAY 13 2021

COMPLETED HCCAB JUL 28 2021

Tribe 12.9

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 2 of 2

HEALTH CARE GRIEVANCE
CDCR 602 HC (Rev. 10/18)

Case 1:22-cv-00843-KES-BAM    Document 31    Filed 10/03/23    Page 33 of 49

Tracking #: SCCHC 21000157

| SECTION C: | Health Care Grievance Appeal. If you are dissatisfied with the Institutional Level Grievance Response, explain the reason below (if more space is needed, use Section C of the CDCR 602 HC A), and submit the entire health care grievance package by mail for Headquarters' (HQ) Level health care grievance appeal review. Mail to: Health Care Correspondence and Appeals Branch, P.O. Box 588500, Elk Grove, CA 95758. |
|---|---|

Grievances "Were Not" picked up from 12/27/20 (maybe before) until 1/7/21. The only way to see that is look for "ANY" grievance that was "Recieved" between 12/27/20 and 1/7/21 at Sierra Conservation Center on Fac B! Leaving a grievance in "the Box" for 11 days is no excuse for your Time Elapses. Back dating is illegal, and Changeing the Subject is Confusing. (You gave me Covid-19 and you dropped the Ball on time, PERIOD)

Grievant Signature:

Date Submitted: 5/5/21

| SECTION D: | HEALTH CARE GRIEVANCE APPEAL REVIEW HQ LEVEL: Staff Use Only | Is a CDCR 602 HC A attached? ☒ Yes ☐ No |
|---|---|---|

This grievance has been:

☐ Rejected (See attached letter for instruction):  Date: _____  Date: _____

☐ Withdrawn (see section E)  ☒ Accepted

☐ Amendment  Date: _____

Interview Conducted?  ☐ Yes  ☒ No  Date of Interview: _____  Interview Location: _____

Interviewer Name and Title (print): _____  Signature: _____  Date: _____

| Disposition: See attached letter | ☐ Intervention | ☒ No Intervention |
|---|---|---|

**This decision exhausts your administrative remedies.**

HQ Use Only: Date closed and mailed/delivered to grievant: **JUL 28 2021**

| SECTION E: | Grievant requests to WITHDRAW health care grievance: I request that this health care grievance be withdrawn from further review. Reason: |
|---|---|

Grievant Signature: _____  Date Submitted: _____

Staff Name and Title (Print): _____  Signature: _____  Date: _____

# STAFF USE ONLY

Distribution: **Original** - Returned to grievant after completed; **Scanned Copy** - Health Care Appeals and Risk Tracking System 2.0 (Do not place in central file or health record)

*Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*

STATE OF CALIFORNIA
HEALTH CARE GRIEVANCE ATTACHMENT
CDCR 602 HC A (10/18)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 1 of 2

Case 2:20-cv-00043-KJM-BAM   Document 31   Filed 10/03/23   Page 34 of 49

| STAFF USE ONLY | |
|---|---|
| Tracking #: | SCC HC 21000157 |

Attach this form to the CDCR 602 HC, Health Care Grievance, only if more space is needed. Only one CDCR 602 HC A may be used.
**Do not exceed more than one row of text per line. WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First, MI): | CDCR Number: | Unit/Cell Number: |
|---|---|---|
| Marsala, Joseph, A. | AF9575 | 59/12 low |

**SECTION A** — Continuation of CDCR 602 HC, Health Care Grievance, Section A only (Explain the applied health care policy, decision, action, condition, or omission that has had a material adverse effect upon your health or welfare for which you seek administrative remedy):

I did not know this Appeal was neglected to be answered, until I received an answer from SCC HC 21000004 on "todays" date 3/5/21. (which had NOTHING to do with medical, Only how S.C.C. FAILS TO MAKE ANY FORMS AVAILABLE TO THE INMATES LIVING IN DORMS WHILE ON LOCKDOWN)

Why has my Grievance filed on 12/27/20 NOT been addressed Yet? I will NOT Chase this Red Heron!

Grievant Signature _____     Date Submitted: 3/5/21

**SECTION B:** Staff Use Only: Grievants do not write in this area. Grievance Interview Clarification. Document issue(s) clarified during interview.

Name and Title _____     Signature: _____     Date: _____

RECEIVED
SCC
MAR 10 2021
HCGO

COMPLETE
@ SCC
MAY 03 2021
HCGC

RECEIVED
HCCAB
MAY 13 2021

COMPLETED
HCCAB
JUL 28 2021

STAFF USE ONLY

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
HEALTH CARE GRIEVANCE ATTACHMENT
CDCR 602 HC A (10/18)

Case 1:22-cv-00843-KES-BAM    Document 31    Filed 10/03/23    Page 35 of 49

Tracking #: SCC HC 2100157

| SECTION C: | Continuation of CDCR 602 HC, Health Care Grievance Appeal, Section C only (Dissatisfied with Health Care Grievance Response): |
|---|---|

Is this really a remedy? Documenting unrelated 602 of Medical form Unavailability as the Exposure to Covid-19 grievance

Take a look at "Actual Grievance's 1-6 and you'll find that None are addressed on this Institutional Level Response

Grievant Signature: _____    Date Submitted: 5/5/21

| SECTION D: | Staff Use Only. Grievants do not write in this area. Grievance Appeal Interview Clarification. Document issue(s) clarified during interview (If necessary at HQ Level). |
|---|---|

Name and Title: _____    Signature: _____    Date: _____

# STAFF USE ONLY

Distribution: Original - Returned to grievant after completed, Scanned Copy - Health Care Appeals and Risk Tracking System 2.0 (Do not place in central file or health record)

*Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*

NAME: Joseph Massala
CDCR # AF4573
HOUSING Fac. B/54/12 low
SIERRA CONSERVATION CENTER
5150 O'BYRNES FERRY ROAD
JAMESTOWN, CA 95327

**STATE PRISON**
**GENERATED MAIL**

Chief I.A.O.
Dept. of Corrections and Rehab.
P.O. Box 942883
Sacramento, Ca.
94283



CALIFORNIA DEPARTMENT *of*
**Corrections and Rehabilitation**

# CLAIMANT APPEAL CLAIMS DECISION RESPONSE

**Re:** Appeal Claims Decision Response

**Offender Name:** MARSALA, JOSEPH AUGUST          **Date:** 05/08/2021
**CDC#:** AF9575
**Current Location:** SCC-Facility B          **Current Area/Bed:** B  001E2 - 059012L

**Log #:** 000000074630

---

**Claim #  001**

**Institution/Parole Region of Origin:** Sierra Conservation Center          **Facility/Parole District of Origin:** SCC-Facility B
**Housing Area/Parole Unit of Origin:**
**Category:**  COVID-19          **Sub-Category:**  Social Distancing

The California Department of Corrections and Rehabilitation (CDCR) Office of Appeals received this claim on 03/08/2021.

California Code of Regulations, title 15, provides the Office of Appeals 60 calendar days to complete a response. Due to the expiration of time, this response by the Office of Appeals will be the only response.

You do not need to resubmit this claim to the Office of Grievances or to the CDCR Office of Appeals.

**Decision: Time Expired**

---

**Claim #  002**

**Institution/Parole Region of Origin:** Sierra Conservation Center          **Facility/Parole District of Origin:**  SCC-Facility B
**Housing Area/Parole Unit of Origin:**
**Category:**  General Employee          **Sub-Category:**  Other Staff Misconduct - NOS
Performance

## I. ISSUE ON APPEAL

Appellant asserts CDCR was negligent regarding the safety and security of the inmate population during the Covid-19 crisis. Appellant contends being exposed to COVID-19 after bed moves were made from quarantine Dorms 51 & 53 to Dorm 69 on December 15, 2020, on Third Watch.

## II. RULES AND REFERENCES

### A. CONTROLLING AUTHORITY

Title 15, section 3000, 3001, 3005, 3999, 3484, 3485 and 3486

### B. DOCUMENTS CONSIDERED

CDCR Form 602, Log #74630
Memorandum dated April 08, 2020, COVID-related Cleaning Protocols for Institutions authored by Director, C. Gipson
Memorandum dated April 16, 2020, CALPIA Cloth Face Barrier/Masks authored by Director, C. Gipson.
Memorandum dated May 11, 2020, Guidance for Daily Program Regarding Social Distancing for Cell or Alternative

## III. REASONING AND DECISION

The California Department of Corrections and Rehabilitation (CDCR), Office of Grievances at SCC received your Form 602 on January 5, 2021. In your grievance, you express concern for your health and complain that CDCR is not doing enough to address the COVID-19 pandemic. You specifically allege being exposed to the virus due to staff being underprepared not wearing mandated masks. During the fact gathering, an interview with appellant was conducted and appellant failed to provide names of staff not wearing masks, therefore the fact gatherer was not able to substantiate the claims. CDCR understands the risks that the COVID-19 pandemic presents to CDCR inmates, staff, and volunteers. In light of these risks, CDCR is taking the following steps:

 Requiring testing of all adult institutions operations and health care staff statewide, regardless of the number of COVID-19 cases. Baseline testing at all institutions is planned to be completed by July 16. Fifteen prisons have completed staff baseline testing. These include SQ, ASP, COR, CCC, HDSP, CHCF, CMF, CCWF, SOL, CIM, CRC, ISP, CVSP, CEN and CCI. Baseline testing at the remaining twenty facilities is scheduled at the remaining institutions (PBSP, FSP, SAC, MCSP, SCC, DVI, VSP, CTF, SVSP, PVSP, SATF, NKSP, WSP, KVSP, CMC, LAC, CIW, CAL, CAC and RJD). Serial testing of employees will occur at institutions who have positive test results every 14 days until no new cases are identified in two sequential rounds of testing; the facility may then resume their regular surveillance testing schedule.

 Conducting surveillance testing of incarcerated individuals at all adult institutions. Surveillance testing is used to detect outbreaks in an early phase, even before the development of symptoms. This voluntary testing will be performed across multiple facilities at each institution each month. Priority will be given to asymptomatic individuals who have been identified as vulnerable or high-risk for complications of COVID-19.

 Reducing the population in its institutions by more than 10,000 since mid-March through the suspension of county jail intake, as well as the expedited release of approximately 3,500 incarcerated persons in April.

 Mandating verbal and temperature screenings for staff before they enter any institutions and other CDCR work sites.

 Suspending visitation, volunteers, and group programming.

 Suspending movement within and between institutions, other than for critical purposes

 Activating every institution's Incident Command Post, regardless of COVID-19 status at the prison, jointly commanded by custody and health care staff to prepare for an outbreak, including identifying quarantine/isolation space, planning for continued operations in the events of staff shortages, and procuring adequate Personal Protective Equipment for inmates and staff.

 Supporting increased physical distancing, including reducing the number of people who use common spaces at the same time, transferring people out of lower level dorms to celled housing, and erecting tents to create alternate housing and care sites

 Reinforcing its commitment to hygiene, both institutional and personal, including greater availability of soap and hand sanitizer.

 Developing comprehensive health care guidelines based on Centers for Disease Control and Prevention and California Department of Public Health recommendations for correctional settings, which include procedures for infection control, assessment, testing, treatment, proper use of Personal Protective Equipment and quarantine/isolation.

 Providing educational materials to all staff and incarcerated people, including posters, quick reference pocket guides, webinars, and educational videos.

CDCR is doing its best to mitigate all those risks in close collaboration with the medical experts working for the Federal Receiver's Office. Furthermore, we will continue to work with all of our health care partners across the Department, throughout the State, and with the Federal Government to create a safe environment for all in our institutions.

If you believe you are still sick, you should request to see a medical provider. If you are in need of more cleaning supplies, please talk with the correctional supervisor on duty or your correctional counselor.

The Office of Appeals determined that there is insufficient evidence that the institution or Department has violated policy with regard to the pandemic. Therefore, the claim is denied.

## IV. REMEDY

Your claim has been denied. Therefore, there is no applicable remedy.

**Decision: Denied**

After a thorough review of all documents and evidence available at the time of this written decision, it is the order of the Office of Appeals that this claim is denied. This decision exhausts the administrative remedies available to the claimant within CDCR.

| Staff Signature | Title | Date/Time |
|---|---|---|
| H. Moseley [MOHO002] | Chief | 05/08/2021 |

STATE OF CALIFORNIA
**APPEAL OF GRIEVANCE**
CDCR 602-2 (03/20)

Page 1 of 2

DEPARTMENT OF CORRECTIONS AND REHABILITATION

| STAFF USE ONLY | |
|---|---|
| Appeal #: | Date Received: |
| Date Due: | |
| Categories: | |
| Grievance #: | 000000074630 |

Claimant Name: _Marsala_  CDCR #: _AF9575_

Current Housing/Parole Unit: _____  Institution/Facility/Parole Region: _____

REC BY OOA
MAR 0 8 2021

☐ There are no claims that can be appealed.

☐ The following claims cannot be appealed:

Claim #s: 001   It is unclear to me what Asterisk is being deemed claim #001,
Claim #002 etc. Also you grant a claim knowing that I'll be forced to wait 30 days
to force it to be implemented what you granted. Names of those Responsible...

_This is the process to appeal the decision made regarding a claim that is not listed above._

Claim #: #002

Explain the reason for your appeal of any claims not listed above. Be as specific as you can.

I am dissatisfied with the response I was given because _You do not address Asterisk 2, 3, 4,
5, 6, 7, 8 is deemed claim #2 (but you have MANY CAMERA'S and do not
need me to NAME EMPLOYEES with no masks); 9, 10, 11, 12_

I Appeal claims I identified as 1 and 2 and would rather
Asterisk #13 summarize asterisks 2 through 13 and be recognized
as Claim #2 Mainly that "Leadership failed to protect me from being
Exposed to a Seriously Communicable Disease"

Are there documents that would be helpful to support your position? Attach copies of those documents, if you don't have the documents, identify them as best you can below:

D.P.S.R.'s for Facility B for Month of December to count the
Quarantined Days for Dorm's 51 and 53 prior to moving (4) of
them into Dorm 69 giving me Covid-19 and Quarantine guideline
for exposed inmates.

DISTRIBUTION   Original: Claimant's File   Copies: DAI, DAPO, and Claimant

STATE OF CALIFORNIA
## APPEAL OF GRIEVANCE
CDCR 602-2 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 2 of 2

Claim #: _____

Explain the reason for your appeal. Be as specific as you can.

*I am dissatisfied with the response I was given because* _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Are there documents that would be helpful to support your position? Attach copies of those documents, if you don't have the documents, identify them as best you can below:

_____

_____

_____

_____

_____

**Reminder:** Please attach all documents in your possession that support your claim(s).

Please note that this form and supporting documents will not be returned to you.

Claimant Signature: _____    Date Signed: 2/23/21

MAIL TO:
Office of Appeals
Department of Corrections and Rehabilitation
P.O. Box 942883
Sacramento, CA 95811

# EXHIBIT



| Name: | MARSALA, JOSEPH AUGUST | | | Institution: | SCC – Sierra Conservation Center |
|---|---|---|---|---|---|
| CDCR: | AF9575 | | | Visit Date: | 04/11/2019 |
| Age/DOB/Sex: | 45 Years | 07/09/75 | Male | PCP: | Williams |

Building:    SCC–Facility B          Unit:    SCC B 001F2          Room:   069                    Bed: 069003U

**NEGATIVE SARS–CoV–2 TEST RESULT:**
You have a Negative COVID–19 test that was done on 12/07/2020 12:00:00
This means that COVID–19 virus was NOT found in your sample.
You can catch the virus in the future so if you develop ANY symptoms from the list below let a staff member know right away. Do NOT wait for the 7362 process.
Continue to wear a mask at all times, stay at least 6 feet from others, and wash your hands often to stop the spread of the virus at our facility.
If you feel okay but have questions, please put in a 7362 form.
COVID–19 symptoms include:
· Fever
· Chills/Shaking Chills
· Cough
· Sore throat
· Trouble breathing or wheezing or chest pain
· Feeling unusually weak or tired
· Muscle aches or soreness
· Loss of smell or taste
· Runny or congested nose
· Nausea, Vomiting or Diarrhea (3 or more loose stools/24 hours)
· Poor appetite
· Eye Redness +/– drainage (pink eye, not allergy)Fever
· Headache or Dizziness or Confusion

Sincerely,

*Williams, Chris PA*

| Name: | MARSALA, JOSEPH AUGUST | | | Institution: | SCC – Sierra Conservation Center |
|---|---|---|---|---|---|
| CDCR: | AF9575 | | | Visit Date: | 04/11/2019 |
| Age/DOB/Sex: | 45 Years | 07/09/75 | M: le | PCP: | Williams |

| Building: | SCC–Facility B | Unit: | SCC B 001F2 | Room: | 069 | Bed: | 069003U |
|---|---|---|---|---|---|---|---|

**NEGATIVE SARS–CoV–2 TEST RESULT:**
You have a Negative COVID–19 test that was done on 12/11/2020 12:00:00.
This means that COVID–19 virus was NOT found in your sample.
You can catch the virus in the future so if you develop ANY symptoms from the list below let a staff member know right away. Do NOT wait for the 7362 process.
Continue to wear a mask at all times, stay at least 6 feet from others, and wash your hands often to stop the spread of the virus at our facility.
If you feel okay but have questions, please put in a 7362 form.
COVID–19 symptoms include:
· Fever
· Chills/Shaking Chills
· Cough
· Sore throat
· Trouble breathing or wheezing or chest pain
· Feeling unusually weak or tired
· Muscle aches or soreness
· Loss of smell or taste
· Runny or congested nose
· Nausea, Vomiting or Diarrhea (3 or more loose stools/24 hours)
· Poor appetite
· Eye Redness +/– drainage (pink eye, not allergy)Fever
· Headache or Dizziness or Confusion

Sincerely,

*Williams, Chris PA*



EXHIBIT

E



MARSALA, JOSEPH A

| Patient Information | Specimen Information | Client Information |
|---|---|---|
| **MARSALA, JOSEPH A**<br><br>**DOB: 07/09/1975    AGE: 45**<br>Gender:   M<br>Phone:    NG<br>Patient ID: AF9575 | Specimen:   SA390293B<br>Requisition: 6450971<br>Lab Ref #:   2035307435<br><br>Collected:   12/18/2020 / 12:00 PST<br>Received:    12/18/2020 / 23:48 PST<br>Faxed:       12/21/2020 / 03:33 PST | Client #: 36006010     MAIL000<br>WILLIAMS, CHRIS<br>SIERRA CONSERVATION CENTER<br>Attn: JAMESTOWN<br>5100 O BYRNES FERRY<br>JAMESTOWN, CA 95327 |

## SARS CoV 2 [COVID-19] Tests

| Test Name | Result | Reference Range | Lab |
|---|---|---|---|
| SARS CoV 2 RNA(COVID 19), QUALITATIVE NAAT | | | SLI |
| SARS CoV 2 RNA | DETECTED | NOT DETECTED | |

A Detected result is considered a positive test result for COVID-19. This indicates that RNA from SARS-CoV-2 (formerly 2019-nCoV) was detected, and the patient is infected with the virus and presumed to be contagious. If requested by public health authority, specimen will be sent for additional testing.

Please review the "Fact Sheets" and FDA authorized labeling available for health care providers and patients using the following websites: https://www.questdiagnostics.com/home/Covid-19/HCP/ QuestLDT/fact-sheet.html https://www.questdiagnostics.com/home/Covid-19/Patients/ QuestLDT/fact-sheet.html

This test has been authorized by the FDA under an Emergency Use Authorization (EUA) for use by authorized laboratories.

Due to the current public health emergency, Quest Diagnostics is receiving a high volume of samples from a wide variety of swabs and media for COVID-19 testing. In order to serve patients during this public health crisis, samples from appropriate clinical sources are being tested. Negative test results derived from specimens received in non-commercially manufactured viral collection and transport media, or in media and sample collection kits not yet authorized by FDA for COVID-19 testing should be cautiously evaluated and the patient potentially subjected to extra precautions such as additional clinical monitoring, including collection of an additional specimen.

Methodology: Nucleic Acid Amplification Test (NAAT) includes RT-PCR or TMA

Additional information about COVID-19 can be found at the Quest Diagnostics website: www.QuestDiagnostics.com/Covid19

Physician Comments:

**PERFORMING SITE:**

SLI    QUEST DIAGNOSTICS NICHOLS VALENCIA, 27027 TOURNEY ROAD, VALENCIA, CA 91355-5386 Laboratory Director: THOMAS MCDONALD,MD, CLIA: 05D0550302

Quest, Quest Diagnostics, the associated logo and all associated Quest Diagnostics marks are the trademarks of Quest Diagnostics.

# EXHIBIT



Description of this Exhibit _____

_____
_____
_____
_____

Number of Pages          _____

# Executive Staff

## Secretary:

○ KATHLEEN ALLISON (https://www.cdcr.ca.gov/about-cdcr/secretary/)

## Undersecretaries:

○ JENNIFER BARRETTO – Undersecretary – Administration
○ JEFFREY MACOMBER – Undersecretary – Operations
○ Dr. DIANA TOCHE – Undersecretary – Health Care Services

## Assistant Secretaries:

○ VICKY WATERS – Assistant Secretary and Special Advisor – Office of Public and Employee Communications
○ JENNIFER NEILL – Assistant Secretary/Chief Counsel – Legal Affairs
○ SARAH LARSON – Assistant Secretary – Legislative Affairs

## Directors:

### OPERATIONS

○ HEATHER BOWLDS – Director – Division of Juvenile Justice
○ BRANTLEY CHOATE – Director – Division of Rehabilitative Programs
○ CONNIE GIPSON – Director – Division of Adult Institutions
○ GUILLERMO VIERA ROSA – Director – Division of Adult Parole Operations

### ADMINISTRATION

○ DEAN BORG – Director – Division of Facility Planning, Construction and Management
○ AMY MILLER – Director – Division of Correctional Policy Research and Internal Oversight
○ KRISTIN MONTGOMERY – Director –Division of Enterprise Information Services
○ STACY LOPEZ – Director – Division of Administrative Services

### HEALTH CARE

○ Dr. JOSEPH BICK – Director – Division of Correctional Health Care Services – California Correctional Health Care Services
○ TAMMY FOSS–Director– Correction Services – California Correctional Health Care Services
○ LARA SAICH – Director–Health Care Policy and Administration – California Correctional Health Care Services

## Deputy Directors:

### OPERATIONS

○ AMY CASIAS – Deputy Director, Program Support – Division of Rehabilitative Programs
○ VACANT – Deputy Director, Adult Parole Operations – Division of Adult Parole Operations
○ KEVIN HOFFMAN – Deputy Director, Program Operations – Division of Rehabilitative Programs
○ JARED LOZANO – Deputy Director, Facility Support – Division of Adult Institutions
○ JASON LOWE – Deputy Director, Operations and Programs – Division of Juvenile Justice
○ KIMBERLY SEIBEL – Deputy Director, Facility Operations – Division of Adult Institutions

### ADMINISTRATION

○ CHRIS CHAMBERS – Deputy Director, Research – Division of Correctional Policy Research and Internal Oversight
○ DAVID CHRISS – Deputy Director, Internal Affairs – Division of Correctional Policy Research and Internal Oversight
○ DEVIN FONG – Deputy Director, Business Services – Division of Administrative Services
○ CHRISTOPHER LIEF – Deputy Director, Facilities – Division of Facility Planning, Construction and Management
○ DERRICK MARION – Chief, Office of Correctional Safety – Division of Correctional Policy Research and Internal Oversight
○ ANNEMARIE DEL MUGNAIO – Deputy Director, Peace Officer Selection and Employee Development – Division of Correctional Policy Research and Internal Oversight
○ JACLYN PADILLA – Deputy Director, Human Resources – Division of Administrative Services
○ EDMOND BLAGDON – Deputy Director, Integrated Business & Technology Solutions – Division of Enterprise Information Services
○ RICHARD GILLESPIE – Deputy Director, Infrastructure and Operations – Division of Enterprise Information Services
○ MARC WILSON – Deputy Director, Audits and Court Compliance – Division of Correctional Policy Research and Internal Oversight
○ MADELYNN MCCLAIN – Deputy Director, Fiscal Services – Division of Administrative Services

### HEALTH CARE

○ Dr. AMAR MEHTA – Deputy Director, Mental Health Services – Division of Health Care Services
○ Dr. MORTON ROSENBERG – Deputy Director, Dental Services – Division of Health Care Services

## Associate Directors:

### OPERATIONS

○ SARINA CALDERON – Associate Director, Office of Civil Rights Operations
○ RONI DAVIS – Associate Director, Reception Centers – Division of Adult Institutions
○ DANIEL CUEVA – Associate Director, Female Offender Programs and Services – Division of Adult Institutions
○ MATTHEW ATCHLEY – Associate Director (A) High Security, Males – Division of Adult Institutions
○ MARION SPEARMAN – Associate Director, General Population, Males – Division of Adult Institutions

### ADMINISTRATION

○ HOWARD MOSELEY – Associate Director, Office of Appeals – Division of Correctional Policy Research and Internal Oversight

○ YING SUN – Associate Director, Regulations and Policy Management – Division of Administrative Services

## Assistant Deputy Directors:

### OPERATIONS

○ MONA HOUSTON – Assistant Deputy Director, Program Operations – Division of Adult Institutions

○ LAURA ELDRIDGE – Assistant Deputy Director (A), Operations Support – Division of Adult Institutions

○ MARVIN SPEED – Assistant Deputy Directory – Division of Adult Parole Operations

## Chiefs:

### OPERATIONS

○ MARIA HUDSON – Chief Financial Officer, Juvenile Administration and Operations – Division of Juvenile Justice

○ SHAD PULLEY Chief – Office of Policy Standardization – Division of Adult Institutions

○ KATIE JAMES – Chief – Office of Victim and Survivor Rights & Services

○ SARA SMITH – Chief – Office of the Ombudsman

### ADMINISTRATION

○ ROBERT RAMIREZ – Chief – Office of Labor Relations

○ J. JOHN McFADYEN – Chief, Office of Internal Affairs (Administrative Operations) – Division of Correctional Policy Research and Internal Oversight

○ KIRK STINSON – Chief, Office of Internal Affairs (Field Operations) – Division of Correctional Policy Research and Internal Oversight

## Communications & External Affairs:

○ LIZ GRANSEE – Deputy Director, Health Care Communications – Office of Public and Employee Communications/California Correctional Health Care Services

○ KRISSI KHOKHOBASHVILI – Chief, Strategic Communications and External Affairs – Office of Public and Employee Communications

○ DANA SIMAS – Press Secretary – Office of Public and Employee Communications

## Executive Officers:

○ BRENDA GREALISH – Executive Officer – Council on Criminal Justice and Behavioral Health

○ JENNIFER SHAFFER – Executive Officer – Board of Parole Hearings

○ BILL DAVIDSON – Executive Officer/General Manager (A) – California Prison Industry Authority (CALPIA)

### OPERATIONS

○ RACHEL STERN – Executive Officer, Board of Juvenile Hearings – Division of Juvenile Justice

## ADMINISTRATION

○ PAUL BESTOLARIDES – Executive Director, Commission on Correctional Peace Officer Standards and Training – Division of Correctional Policy Research and Internal Oversight

* within each executive title category, listings are alphabetized by last name

Joseph Marsala AF9575
San Quentin Rehabilitation Center
San Quentin, Ca, 94964
5-N-32


IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

Marsala, Joseph
      Plaintiff,                    Case No. 1:22-cv-00843-ADA-BAM (PC)

v                                           PROOF OF SERVICE

Ralph Diaz, et. al.,
    defendants

Your Honorable Judge,M

   Petitioner has supplied the defendants with a copy of the enclosed

1983 Civil Rights Complaint, by placeing a true and correct copy of

it and putting it into an envelopeᶟ addressed to the California Office

of the Attorney general:



   and then handing the envelope to a correctional officer on 09-28-23

who then inspected it, signed, put his badge number upon and sealed

theᶟ envelope , and placed it into the U.S. Mail.


   I, Joseph Marsala , declare under penalty of perjury that the afore-

mentioned facts are true and correct, so help me God.


Date: 9/28/23                                    _Joseph Marsala_
                                         Joseph Marsala